Good morning, Your Honors, and may it please the Court. The prior-art Graupe patent is dispositive of this case. Graupe is an issued U.S. patent that discloses and claims cancellation and substantial cancellation of acoustic feedback in a digital hearing aid that uses a programmable filter in a feedback loop, exactly as recited in Claim 19 of the 850 patent. Now for example, Claim 29, System Claim 29 of the Graupe patent and its corresponding disclosure in the specification can be mapped directly to Claim 19. This was shown by Dr. Soli at trial as he mapped each of the elements of Claim 19 to the Graupe patent. It's illustrated in the table. Does it disclose substantial reduction of feedback? Yes, Your Honor. The Graupe patent discloses cancellation and substantial cancellation of acoustic feedback. Anticipation is a fact issue. We had a lot of testimony saying reduction would not be substantial. That's correct, Your Honor, but here you can't find that substantial reduction is missing from the Graupe patent unless you first find that Graupe is not enabled. Now ETG's expert, Madsen, on cross unambiguously admitted that Graupe had all of the limitations of Claim 19. On redirect, after stating that Graupe does some reduction of acoustic feedback, Madsen qualified his testimony by stating that Graupe's reduction was not substantial because Graupe would not work well. But given this prima facie case of anticipation, the burden of lack of enablement should have shifted to ETG. But at trial and even in their red brief, ETG has refused to embrace this burden. Rather, it continues to argue that Madsen's testimony converts the anticipation inquiry into one having a missing claim limitation. Mr. Stern, we're dealing with a fact issue, the jury found against you, and so just to re-argue the facts is very difficult for an appellate court to absorb. We can't redo what the jury has done, can we? Your Honor, the case, the anticipation issue, there was a prima facie case of anticipation based on the four corners of the Graupe patent in over 50 places in the Graupe patent. They disclosed and claimed cancellation and substantial cancellation of acoustic feedback. Under Impact Labs and its related case law, once the anticipation prima facie case has been shown, the burden shifted to the patent owner to show lack of enablement. And Madsen argued that the prior art did not calculate the correct coefficients and it would not have substantially cancelled. The jury found, apparently, that that was the case. Now, how do we deal with that? Well, Your Honor, under the Impact Lab case, the proper inquiry and the required testimony from Mr. Madsen should have been directed to what a person of ordinary skill in the art would have encountered in trying to make and use the claimed invention of Claim 19 in light of the Graupe patent. He provided no testimony whatsoever in the trial about what a person of ordinary skill in the art would have encountered, what difficulties they would have found with the Graupe patent, and what information they would have known themselves as they addressed the issue. So the burden clearly shifted from showing of anticipation. The fact that Mr. Madsen argued that the efficacy of the hearing aid, the performance of the hearing aid, was not what it could have been begs the question in the sense that enablement is not based on efficacy. This was properly an enablement inquiry. And there was no evidence provided to the jury or to the court on the critical issue, as was the case in Impact's lab, of what a person of ordinary skill in the art would have done. Well, why is the question of whether there's a disclosure of a substantial reduction in an enablement question and not simply a failure of the reference to show a limitation? Your Honor, the reference shows the limitation because, first of all, the term substantial is not defined in the 850 patent. There was no testimony on what constitutes substantial. So if you have cancellation, which is arguably 100% substantial reduction, and if you have which must be less than 100%, the question becomes, why does the reference not teach a substantial reduction when substantial reduction, you would argue, would be less than 100% or less than substantial cancellation? So the argument that Madsen used was a very facial argument to say that the hearing aid purportedly would not work well. But he also pointed out that Graupe doesn't test a signal that goes through a transmission channel. Well, Your Honor, as is the case, Graupe breaks the hearing aid connection to do the test. That's exactly the approach that is used during the fitting process in the 850 patent using the controller of Figure 1. Both Graupe and the 850 patent program the hearing aid for the acoustic feedback. In order to do this, you have to provide some type of test signal that is propagated through the acoustic feedback path in order to calculate the characteristics of that path. So Graupe and the 850 patent are right on top of each other in terms of this identification mode or the fitting mode that is disclosed in the 850 patent. What can you tell us about the doctrine of equivalence with regard to Claims 13, 14, and 16? Your Honor, there is a fatal evidentiary gap in the required showing of doctrine of equivalence. The burden, of course, lay on the patent owner to establish a doctrine of equivalence infringement. The evidentiary gap is very simple. The infringement expert for E.T.G. Brown admitted that he never considered the prior art. All he considered was what he knew about the art of hearing aids, but he admitted he never considered the prior art. He did not consider any of the art that was addressed by Mr. Madsen because he stated that it was not his job to do that because Mr. Madsen was the validity expert. Why isn't this case right on point with Hughes v. the United States? You remember that doctrine of equivalence case involving the satellites, Your Honor? Yes, exactly. And the only difference was that the technology had advanced so they could put the programmable feature in that instance on the satellite instead of keeping it in Houston. And isn't that exactly what happened here? Technology advanced so they could now put the chip on the hearing aid rather than having it separate. And that was found to substantiate the doctrine of equivalence in Hughes to the rate of a billion dollars, as you remember that case. Right. And it was a very important case, but there are two fundamental differences, Your Honor, between the Hughes case and what we have here. First of all, the Brow Bay host controller, if you will, used for the identification mode is actually part of the hearing aid, unlike Figures 1 and Figures 2 where they separate the host controller from the hearing aid in the 850 pad. Exactly what was done in Hughes. It was separated, but as technology advanced, they could put it onto the satellite itself because it became smaller and easier and cheaper to program it right on the satellite. But the host controller in the 850 pad has no ability, nor is there any disclosure that teaches anyone of ordinary skill in the art how you would recalculate the coefficients used for the substantial reduction, whatever that means, of the acoustic feedback that the hearing aid exhibits when it's in the ear of the wearer. You need to characterize that acoustic feedback path. That is done during the fitting process. In addition, there was testimony from the inventor and others, Your Honor, that the technology of the LMS filters that are in the Hughes devices, that was well known at the time of the filing of the patent, so it was not a later developed technology situation. Mr. Stern, you've gone two minutes into your brother's time. Your Honor, I asked for my brother's time to be given back to him. Well, that's nice, but it's not your opportunity. I'm going to have to move to Mr. Mandier. Okay, thank you, Your Honor. You'll have to talk a little faster. Thank you, Your Honor. I'll get right to it. May it please the Court. I'd like to address a couple of the questions that was given to Mr. Stern concerning supposedly wrong calculations and the test signals in the wrong place. Those are not issues about what RAPI discloses. RAPI discloses, for sure, canceling feedback. We have 40 or more sites that say it cancels. So, the question they're saying is, it doesn't work well. It doesn't work as it says it in the patent itself. And as we set forth in our brief, we think that's conclusory. It doesn't make any sense to us, but it's really, it comes down to an enablement issue. That's what they're arguing. They're not arguing that RAPI doesn't disclose substantial cancellation of acoustic feedback. They can't argue that. It does it over and over. They're saying what the circuit that RAPI discloses doesn't work. In fact, he says, their expert says, it works. It does reduce feedback. It just doesn't reduce substantial acoustic feedback, again, whatever that means. So, that's why it's an enablement issue. The impact lab case that's cited in our brief is right on, where they had the burden to show that, because it's an issued U.S. patent, they have, ETG has the burden to show that it was not enabled. And there's just nothing in this record from the point of view of one of OrdinarySkill who, what that person would do with a drop-in reference, assuming there are some flaws in the circuitry as they point out. There's nothing in the record to say that one of OrdinarySkill could not use the disclosure of RAPI, along with his own personal knowledge, and build the hearing aid that's in Claim 19. Again, come back to the question, is this a question of fact? Enablement is a question of law, and we think this case, if we look at it from anticipation, we think it is a question of fact for sure. But no reasonable jury could say it's not anticipated. The only way you can find that this substantial reduction is missing in GRAPI is if you find it's not enabled. And enablement is an issue of law. And there's no testimony... But the question of whether they put in evidence to overcome the enablement... Assumption. ...that you have GRAPI, is that a question of fact for the jury? There are factual underpinnings for that issue, for the enablement issue. Ultimately, it's an issue of law. But there are factual issues that need to be put forth. For example, in Ray Wan's experimentation factors, those are issues that they should have put in, but they didn't. Let me just turn, if I do have a moment, to this issue of... To claim construction and the word programmed in the context of program filter. It's our position that if program filter is not limited to setting or fixing the coefficients during normal operation, then there's a violation of the written description requirement. Because the patent does not teach anything other than two different modes, a programming mode and a normal operation mode. During normal operation, you can change the coefficients. It's programmed and set. ETG's own expert has admitted that. Let me go quickly to the Hughes case that was mentioned. Let's assume for a moment that it is exactly like Hughes, and you could put the host controller that in the patent is offsite in the audiologist's office. You could just put it into the hearing aid. In Houston, yeah. Right, in Houston. So if you do that, where are you? You're at Grappe. That's exactly Grappe. Grappe has a host controller on the hearing aid. It figures out, it has a programming mode and a normal mode. And during the programming mode, it figures out the coefficients. It goes offline, then it comes back online and sets those coefficients. But during normal operation, it's fixed. You can't change the coefficients. You've got to go into the programming mode. The Hughes products are LMS filters. They change during normal operation. The coefficients change. There's no calculation of coefficients. You're only looking at the output, and you're figuring out, is this output a good thing? Let's not change the coefficients too much. If it's bad, let's change the coefficients. And it constantly does that to adapt to the ever-changing acoustic feedback. You're into your rebuttal time. Okay, thank you, Your Honor. Thank you. Mr. Barocco? Yes, Your Honor. May it please the Court, Brian Barocco on behalf of ETG. I'll start first with the claim construction issue Mr. Mander just addressed. Your Honor, the term... You get the full 15 minutes, so you don't have to talk as fast as you can. Thank you, Your Honor. I will slow down. The term at issue here is the term programmed. And through that single word, the defendants have asked this court to bring in three new claim limitations to the claim. They want the claim to now be fixed, for the coefficients to be fixed. They want them to have been calculated during a fitting process, and they want them to have been calculated from an external post-controller. None of those things are recited in the claim. The context of the word programmed in the claims, 13, 14, and 19, is to describe what the filter does. In 13 and 14, it's a filter that is programmed to equalize and reduce the effect of said acoustic feedback, both in amplitude and phase, on a signal in the transmission channel. And in 19, it's to affect substantial reduction of acoustic feedback. The definition the court gave of a... being provided with values to achieve a response is exactly the right definition that should have been applied and was applied. Now, they also argue... If that is the correct claim construction, is there a problem with the written description providing sufficient support for that threat?  There was extensive testimony by both parties in the trial. And again, written description is a question of fact to be reviewed for substantial evidence. There was the testimony of the inventor who described how he conceived of the idea of keeping the host controller connected to the hearing aid while the user was wearing it. There's a suggestion from the appellant that there's testimony that you always disconnected the host controller, and that's not correct. There was testimony from Mr. Brown, for example, at... Sorry, I have the wrong quote here. Would a person of ordinary skill in the art in 1986 understand that the hearing aid or host controller could be connected during normal operation? Answer, yes. In fact, many of my customers were doing this, building their breadboard first or prototype building, building it in a little box, letting people walk around with it. That was the normal practice that we did. His testimony, the inventor's testimony, or Dr. Leavitt, who was an experienced audiologist at the time, and the actual specification itself, which describes connecting the host controller to create the coefficients, all describe both fixed and adaptive determination of acoustic feedback. So we believe that given the standard of review, there's substantial evidence to support the written description finding from the jury. Is the adaptive feedback disclosed used for the same purpose? Are there two different techniques of filtering used for two different... to accomplish two different things? Well, there's a number of different filterings going on in this pattern. There's filtering for purposes of hearing loss. There's filtering for purposes of noise reduction. There's filtering for room reverberation, filtering for feedback cancellation. And we believe the testimony was that for all of those kinds of filtering, there's a disclosure of doing so adaptively. And I also forgot to mention there's a third declaration of Dr. Eric Dowling that came into evidence, and he testified, and through a declaration that was submitted, that there was also a written description for adaptive feedback cancellation. For acoustic feedback? Adaptive feedback. Acoustic feedback cancellation, yes, Your Honor. And where is that disclosure? Dr. Dowling? I mean, where is it in the patent specification? Well, the disclosure is, first you look at column one, which says that the patent relates to hearing aids of the character that are capable of automatically adjusting to, and as we read this, there's a number of things that adjust to, including reducing acoustic feedback. Is the reference at the top of column 10, does that relate to acoustic feedback? Talking about column 10 lines 9 through 15, for example. Yes, Your Honor, we submit, and there was testimony from Mr. Brown and from Dr. Levitt, the inventor, that the paired comparison technique could also be used after you've... Column 9, just before that, there's a description of how you come up with the coefficients for feedback cancellation. And in the next paragraph, it says... Is that at line 12? Of column 9, Your Honor? Column 9, yes, where are you at? Yes, column 9 starts in line 12 and goes all the way through to line 55, describes one example of how you come up with the feedback cancellation coefficients, notably in around line 37, it says that you've got the host controller hooked up to the hearing aid in line 37, it says the programmable phase shifter 30 and programmable amplifier 32 are then adjusted by the computer to minimize the sum of the acoustic and electrical feedback signals of the output of summing amplifier 60. It's an iterative process, the computer adjusts those two parameters until it determines a null, it then uses those coefficients to be provided to the filter, and there was testimony that you could do this iteratively while the user continues to wear the device, and so that, we believe, is the disclosure that was sufficient to provide the written description in this case. But the user and the hearing aid worn by the user would have to be connected to the host computer throughout this whole process, correct? In this example, yes, it was contemplated that eventually, as technology advanced through miniaturization and other advances, you would be able to take the host controller and put it in a side pocket or wherever for the person to wear, and that's exactly, to Chief Judge Rader's point, that's what happened here. The functionality that's described in this pattern for the host controller is now all built into the hearing aid due to the size of chips. So, the LMS algorithm arguably does the exact same analysis here, it tweaks the coefficients until it gets a null summation, and then it uses those coefficients to continue to iteratively program the filter that's in the feedback path. But the key problem between you and your colleagues on the other side seems to be whether you, in your patent, anticipated that advance in technology. Isn't that what's really at stake here? Yes, Your Honor, and I think that is a fact issue that went to the jury. The jury rejected their argument based on the testimony of three different people of very skilled yard. Dr. Levitt, the inventor, Mr. Brown, our expert, and the third expert, the so-called third expert, Dr. Dowling, whose declaration came into evidence. Given all that evidence, we think there's sufficient, substantial evidence to support the jury's verdict on written description. What is your comment with respect to the doctrine of equivalence concerning claims 13, 14, and 16? Yes, Your Honor, and I wanted to just clarify that Groutby cannot be dispositive of this case because there's no argument that Groutby anticipates claims 13, 14, and 16. I may have misunderstood Mr. Stern's argument, but Groutby has only asserted to anticipate claim 19. They used Groutby as a way to try to limit the doctrine of equivalence for 13, 14, and 16, but they didn't do their job. Under Wilson Sporting Goods, the burden is actually on them to present a hypothetical claim and demonstrate how the hypothetical claim would have been anticipated by Groutby. The testimony from their expert was very cursory, and when he was asked on cross-examination, did you do a claim-by-claim, element-by-element analysis, he said he did not. So the burden never shifted to ETG, and as a result, we didn't have to present any evidence in response, but we did. Dr. Brown, Mr. Brown, our expert, said that the Groutby system is very different, and then Mr. Matson, our invalidity expert, explained why. And there's a fundamental difference between Groutby and the claims in this patent, and I think Your Honor's hit on it. It's the fact that Groutby does not pay any attention to the amplifier in determining the coefficient, and that's an important point. So in a hearing aid, you've got a microphone, you've got an amplification system or a transmission channel, and you've got a speaker. And Groutby explicitly says, in his disclosure, which is in A213, column 2, in the parameter identification mode, the amplifier is decoupled from the microphone and speaker and is replaced by an identifier circuit. By decoupling the amplifier, according to the present invention, identification is performed in a manner that virtually ignores the amplifier. So the defendants admit that Groutby doesn't meet the determining steps of 13, 14, and 16. Yes, Your Honor. And as with respect to Claim 19 for Groutby, we are arguing, as Judge Lynn picked up, that there is no disclosure of a filter that is programmed to provide substantial reduction of acoustic feedback as recited in Claim 19. In Claim 19, the transmission channel is connected to the microphone and the speaker. So you're trying to calculate what is the feedback path through the transmission channel that includes an amplifier. Groutby just simply cannot do that because his system excludes the amplifier. Whatever coefficients he happens to calculate, don't calculate what is claimed in Claim 19 of the 850. Don't you have a bit of a problem with respect to particularized testimony as to the substantial way wrong of the Doctrine of Equivalence? Well, Your Honor, there's two alternative arguments that were submitted by Mr. Brown on the Doctrine of Equivalence. He did a function-way result analysis. We cited those in our brief. And as Judge Sleet cited in his JMAL decision, Chief Judge Sleet cited in his JMAL decision, Judge Mr. Brown also did an analysis that compared the systems and he says in his own words that there's an insubstantial difference. He doesn't use the word insubstantial difference, but his analysis is such that that's what he is saying. And so given that testimony, we don't need to worry about the function-way result test because there is substantial evidence to support the verdict using that analysis. But Mr. Brown also did the function-way analysis and he gave his opinion giving all three prompts. So we think there is linking testimony in the cites or in our brief for both the determining step and the asserting step in Claims 13, 14, and 16 and the programmable delay line filter element of Claim 19, which is the element that's deemed to be equivalent for Claim 19. So for example, the testimony of Mr. Brown on the determining step is that A729, when he's asked what is your understanding of what an LMS algorithm is and that's the part of the accused device that we say is equivalent to doing the determining step. He describes that it is a routine to look at the coherence between the output and the input and determine where there is a signal present and iterate to a conclusion. which closely approximates the elimination feedback by reducing the error term to a null. And then the next question, does the LMS algorithm specifically measure phase and amplitude? No, it doesn't. It determines the effect on phase and amplitude and that's what the claim requires. It is true that mathematically speaking the coefficients define the amplitude and phase but it's not necessary for them to be defined or read out according to the claim. The effect, that's all that's asked for. Through this testimony, he is giving the jury the basis to find that even if they're not exactly determining phase and amplitude, they are doing something that has the same effect and that closely approximates it. And then similarly, for the inserting step, he gives similar testimony at A730, which is about line 520 or page 529 of the trial transcript. Asked about the inserting step. I'm sorry, it's in A730. What page of the transcript? It starts on 528 and goes over to 529. Question on line 18 of 528. You mentioned, I think, that there are two steps determining and inserting. So now we're going to talk about the inserting step. Are the steps here in the claim performed in that order in the accused products? He says, yes, they are. He then explains that the determining is done by the LMS routine that calculates coefficients and then inserts the coefficients into the filter and thereby sets a new filter, electrical filter response. And he says, quote, in electrical terms, we considered that inserting a filter. So even if there was a requirement that there be some sort of physical insertion or that there be something else that's more literal, he's saying, as an electrical engineer, in electrical terms, we considered that to be inserting a filter. Do you understand anything about the damages issue after the trial court reversed the jury's finding on the 749? Shouldn't there have been something done with the damages award? Well, first of all, Your Honor, we believe this is another issue, as we say in the briefs, that they waived because they did not ask the trial judge after the JML decision in June of 2011 to do that. They first asked for something to be changed here on appeal. Second, there is substantial evidence to support the award under a lump sum analysis. Their expert argued that a lump sum was the appropriate measure of damages, and that's what the jury awarded. In a lump sum analysis, it's really not as important when the patents expire, just what would be the total amount I would be willing to pay in the relevant time frame, which here is 2001 or 2002, to compensate the patentee for all of the damage. The difference of a couple of months between the expiration dates would not have been significant in a lump sum analysis, which is what their expert argued. And we also argue that they waived the issue by not asking for a separate specification of damages between the two different patents. So that's our point on the damages issue. The lump sum award gets strained a bit, doesn't it, when you have one of the two patents disappear from the damages award? Your Honor, this didn't come up clearly in our opening brief, but there is a decision of this court, Wicker v. Standard Register. It's non-presidential, 82 F. 3rd, 434, in which this court did exactly that. There were two patents. One was tossed out, and they said, regardless, because there's a lump sum award, we're going to say that the jury verdict can be sustained. You did say non-presidential. I did say that, Your Honor. I see that I'm into my rebuttal time. It's all reserved, but a few seconds remain. All right, but I don't think your cross-appeal was put into issue by either Mr. Mandier or Mr. Stern, so I'm not sure we'll need his cross-appeal rebuttal, right? Apparently not. Fair enough, Your Honor. I understand. Thank you. I was going to go with that, but you ran out of time. Okay. Thank you. Mr. Stern, we'll give you a minute and Mr. Mandier a minute, and that's probably keeping time pretty even. Thank you, Your Honors. I would like to return to the Grout Bay patent, if I may. Dr. Morley at A958-1422 lines four through eight, as well as Dr. Sully at A1017-19, each testified that Grout Bay was a blocking prior art patent in connection with claims 13, 14, and 16. Now, if you go to the issue of integration of the host controller, Grout Bay shows in its disclosure the integration of the identification circuitry with the hearing aid itself, as found in Figure 3, whereas in the patent itself it's separate figures and separate descriptions. So we submit that the description requirement is not satisfied. But even if you could make that argument legally, the problem is that Grout Bay was filed before the 850 patent. It was never considered by the patent office during the prosecution of the 850 patent, and it's presumed to enable each and every one of its claims. So if you're arguing that Grout Bay does not produce the substantial reduction or substantial cancellation, then you must be arguing that Grout Bay does not enable its own claims, and therefore all of Grout Bay's claims are invalid. Thank you, Your Honor. Thank you, Mr. Stern. Mr. Mandier? Your Honor, I'd like to turn to this inserting step that's found in claims 13, 14, and 16. Judge Lee found that there's an order to these steps. There's first a determining, then an inserting. He also found that the accused products do these steps out of order and therefore denied ETG's motion that there was literal infringement. He said there's no literal. You've got to start with the law. Thank you. We have to ignore what you've said. Thank you, Your Honor. Back to the inserting step. So they're out of order. That's why he said the jury's verdict of no literal infringement should be sustained. But if you look at the records, there's no evidence at all as to why it would be equivalent to do these steps out of order. So we think that's an additional reason why the doctrine of equivalence should be overturned. In addition, as we point in our brief, the inserting step, which Judge Lee found, occurs at the time of manufacture. The manufacture and the accused products here are either in Taiwan or Denmark outside the country. So you have one step of each one of these method claims where a step is performed outside the U.S. and for that reason there could be no infringement either literally or under the doctrine of equivalence. Thank you, Mr. Mandir.